## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 23-cv-20422-GAYLES

**ROSENFELD GALLERY, LLC,**

        **Plaintiff,**

**v.**

**TRUIST BANK, successor by merger to**
**SUNTRUST BANK,**

        **Defendant.**

_____/

### <u>ORDER</u>

    **THIS CAUSE** comes before the Court on Defendant's Motion to Dismiss (the "Motion").
[ECF No. 8]. The Court has reviewed the Motion and the record and is otherwise fully advised.
For the reasons set forth below, the Motion shall be granted.

### BACKGROUND[1]

    This action involves two related fraudulent schemes under which Plaintiff Rosenfeld
Gallery, LLC ("Plaintiff") was a victim. Plaintiff seeks to hold Defendant Truist Bank
("Defendant")[2] responsible for its losses.

### I.    The Business Email Compromise Scam[3]

    On February 8, 2022, Plaintiff, an art gallery, sold artwork by the artist KAWS for
$300,000 on behalf of a third-party seller ("Seller") [ECF No. 1 ¶ 4, 14-15]. Following the sale,

---

[1] As the Court is proceeding on a motion to dismiss, it takes the allegations set forth in the Complaint as true. *See
Brooks v. Blue Cross & Blue Shield of Fla. Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997).
[2] Defendant was SunTrust Bank during the relevant time period. Truist Bank is the successor by merger to SunTrust
Bank. For purposes of this Motion, the Court will refer to SunTrust and Truist as Defendant.
[3] According to the Complaint, Business Email Compromise scams occur when a legitimate business email account is
compromised through "phishing" or "hacking" to conduct unauthorized transfers of funds. [ECF No. 1 ¶ 11].

Plaintiff asked Seller for wiring instructions to remit the sale proceeds. *Id.* ¶ 16. In response, at 2:05 p.m., Seller sent Plaintiff an email directing Plaintiff to wire the funds to an account at Citibank, N.A./Goldman Sachs ("Citibank"). *Id.* Two hours later, at 4:11 p.m., Plaintiff received another email, purportedly from Seller directing Plaintiff to wire the funds to an account at Defendant instead of Citibank. *Id.* ¶ 17. On February 9, 2022, Plaintiff wired $300,000 to the account at Defendant. *Id.* ¶ 19.

On February 10, 2022, Seller notified Plaintiff that it had not received the payment. *Id.* ¶ 20. At that time, Seller and Plaintiff realized that Seller's email had been compromised and the instructions to wire the funds to Defendant were fraudulent. *Id.* Plaintiff then contacted the Miami-Dade County Police Department ("MDPD") to report the crime and its bank, First Republic Bank ("First Republic"), to initiate a wire recall. *Id.* ¶ 22. At 4:00 p.m. on February 10, 2022, First Republic issued a wire recall to Defendant. *Id.* ¶ 23. And, at 5:00 p.m., Detective Latrice Golden of the MDPD ("Detective Golden"), contacted Defendant's fraud investigation department to notify it of the fraudulent wire case and the wire recall.[4] *Id.* ¶ 24.

**II.     The Romance Scam[5]**

On August 16, 2021, Kelly Gibson ("Gibson") met a man going by the name William Mueller ("Mueller") on the internet. *Id.* ¶ 37. Gibson and Mueller began an on-line relationship. *Id.* On January 31, 2022, Mueller asked Gibson to receive funds into her checking account with Defendant on his behalf and forward those funds to him or others to pay his debts. *Id.* ¶ 38. To that end, on February 9, 2022, Gibson received $300,000 into her account with Defendant. *Id.* ¶ 39.

---

[4] The Complaint alleges that, when the fraud first occurred, some of Defendant's employees indicated that the funds were successfully recalled and that the checks would not be honored. [ECF No. 1 ¶¶ 25-27, 45].
[5] According to the Complaint, romance scams occur when an individual believes they are in a relationship and are tricked into sending money, personal information, or items of value to the perpetrator or, in some cases, to launder money or items to assist the perpetrator. [ECF No. 1 ¶ 12].

Although Gibson did not know at the time, the $300,000 were the misdirected funds from Plaintiff. *Id.* On February 10, 2022, in accordance with Mueller's instructions, Gibson had Defendant issue two cashier's checks: the first for $93,462.00 made out to Olivia Bruce in Shelby, Minnesota and the second for $97,278.00 made out to Aqua Wave Investments in Mason, Ohio. *Id.* ¶ 40. The same day, at 12:41 p.m., Gibson sent each cashier's check to the intended recipients via Federal Express. *Id.* ¶ 41. Based on this timeline, the cashier's checks were issued and mailed before First Republic issued the wire recall to Defendant and before Detective Golden contacted Defendant's fraud investigation department.

At 5:15 p.m. on February 10, 2022, Gibson attempted to withdraw money from her account with Defendant from an ATM. Her request was declined. *Id.* ¶ 42. When she logged in to her account online, she and learned that it was frozen. *Id.* Gibson called Defendant at 6:15 p.m., and one of its employees told her that the Loss Prevention Department closed her account. *Id.* ¶ 43. When Gibson visited her local bank branch the next day and explained that she received two checks the day before, Defendant's local bank branch manager told her that those checks would not be honored. *Id.* ¶ 45.

Gibson contacted Mueller, who assured her that everything would be okay. *Id.* ¶ 46. For the next month, Gibson made several attempts to unfreeze her account. On March 13, 2022, Mueller told Gibson that he needed to leave the country. Gibson had no further interaction with Will. *Id.* ¶ 48. Gibson eventually realized that she had been a victim of a scam. *Id.* ¶ 49.

## III.     The Aftermath of the Fraud

On March 3, 2022, Plaintiff received a wire returning $113,250.56 of the $300,000. *Id.* ¶ 29. On March 15, 2022, Defendant advised Detective Golden that the remaining balance of

$186,749.44 had not been successfully recalled. *Id.* ¶ 30. Defendant did not send any further updates to Plaintiff or First Republic.

On June 3, 2022, First Republic—Plaintiff's bank—received a check dated May 31, 2022, from The Huntington National Bank in the amount of $93,462.00 and notified Plaintiff of receipt of the check. *Id.* ¶ 56. The amount of the Huntington Check corresponded with the amount of the cashier's check Gibson had issued to Olivia Bruce. *Id.* ¶ 57. To date, Plaintiff is still missing $93,287.44[6] of the original $300,000 in wired funds. *Id.* ¶ 61.

## IV.    This Action

On February 1, 2023, Plaintiff filed this action against Defendant, alleging claims for aiding and abetting fraud (Count I) and negligence (Count II). *Id.* Defendant now moves to dismiss, arguing failure to state a claim.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must

---

[6] Plaintiff points out that the amount of missing funds, $93,287.44, does not match the amount of the other cashier's check ($97,278). [ECF No. 1 ¶ 62].

"plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla. Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997).

## DISCUSSION

Defendant argues that Plaintiff fails to state a claim for aiding and abetting fraud and negligence because (1) it could not refuse payment on its cashier's checks; (2) Plaintiff's claims are preempted by Article 4 and Article 4A of the Uniform Commercial Code; and (3) Plaintiff fails to allege that Defendant owed it a duty. The Court agrees.

### A.    Cashier's Checks

Plaintiff alleges that "Ms. Gibson received $300,000 by wire (now known to be the funds fraudulently misdirected from the Gallery) into her [] account [with Defendant]." [ECF No. 1 ¶ 39]. In addition, Plaintiff alleges that Ms. Gibson had the two cashier's checks made and attaches copies of those checks to the Complaint. *Id.* ¶ 40; [ECF No. 1-4]. Finally, Plaintiff alleges that "[Defendant] used and/or paid out of the Gallery's funds to satisfy and honor one or both of the cashier's checks, in whole or in part, obtained by Ms. Gibson . . . ." *Id.* ¶ 64. In short, Plaintiff's action in based on Defendant's purported failure to rescind the cashier's checks.[7]

Florida law defines a "cashier's check" as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank." Fla. Stat. § 673.1041(7). "The issuer of

---

[7] In its response to the Motion, Plaintiff argues that the law governing cashier's checks is irrelevant because Plaintiff does not know if the misappropriated funds were used to honor the cashier's checks. Plaintiff's argument is unfounded. Plaintiff attached copies of the cashier's checks to the Complaint and pled that Ms. Gibson procured the checks the day after receiving the $300,000 in stolen funds. Moreover, Plaintiff alleges Defendant breached its duty of ordinary care to Plaintiff because "it facilitated or allowed the withdrawal of funds from Ms. Gibson's account *via the cashing of a cashier's check to an unauthorized party.*" [ECF No. 1 ¶ 86]. The claims in the Complaint are clear—Defendant should have recalled the cashier's checks but failed to do so. As a result, the law regarding cashier's checks is relevant.

. . . a cashier's check . . . is obliged to pay the instrument . . . [a]ccording to its terms at the time it was issued . . ." Fla. Stat. § 673.4121. "Because the bank, as both drawer and drawee, is its own customer when it issues a cashier's check, the bank cannot be liable to itself for failing to stop payment on the check." *Warren Finance, Inc. v. Barnett Bank of Jacksonville*, 552 So. 2d 194, 197 (Fla. 1989). Indeed, "[n]either the bank nor a purchaser of a cashier's check from the bank has a right to 'stop payment' on a cashier's check." *Id. See also Ricardo v. Wells Fargo Bank, N.A.*, No. 21-cv-23278, 2022 WL 6745507, at *5 (S.D. Fla. Jan. 27, 2022) ("a bank cannot dishonor a cashier's check except in limited circumstances[.]").

As detailed in the Complaint, Defendant issued the cashier's checks before it was on notice of the wire recall. [ECF No. 1]. Once the cashier's checks were issued, Defendant, by law, was "obliged to pay" them. Fla. Stat. § 673.4121. Moreover, Defendant could not stop payment on the cashier's checks—even after it became aware of the fraud. *See Warren*, 552 So. 2d at 200 ("a bank's duty to pay its cashier's check when presented for payment should not depend upon whether the presenter of the check is holder in due course."). Accordingly, and as detailed below, Plaintiff's claims—all of which are based on the idea that Defendant should have stopped payment on the cashier's checks—must be dismissed.

## B.     Preemption

Defendant argues that Articles 4 and 4A of the UCC preempts[8] Plaintiff's common law claims for aiding and abetting fraud and negligence. The Court agrees.

Florida Statute § 671.103 provides that common law "principles of law and equity shall supplement" the UCC "[u]nless displaced by the particular provisions" of the code. Fla. Stat. §

---

[8] Florida courts used the term "displacement" to describe the interaction between the UCC, as codified by the Florida Legislature, and common law. *See Corfan Banco Asuncion Paraguay v. Ocean Bank*, 715 So. 2d 967, 970–71 (Fla. 3d DCA 1998). The Eleventh Circuit uses the term preemption. *See Regions Bank v. Provident Bank Inc.*, 345 F.3d 1267, 1274 (11th Cir. 2003). Accordingly, this Court uses the term "preemption."

671.103. Accordingly, "[w]here the rights, duties, and liabilities of the parties are governed by the U.C.C., the Code displaces common law claims." *Anderson v. Branch Banking and Trust Co.*, 119 F. Supp. 3d 1328 (S.D. Fla. 2015); *See also Elite Premium Finance, Inc. v. Wells Fargo Bank, N.A.*, 472 F. Supp. 3d 1231, 1236 (S.D. Fla. 2020) ("Thus, the common law is envisioned to supplement the [UCC], unless it is inconsistent with the provisions, purposes and policies of the [UCC]"). "The code may 'abrogate common law rules without requiring unequivocal, explicit reference to the common law in each statutory section that effects a modification.'" *Treister v. PNC Bank*, No. 05-23207, 2006 WL 8433514, at * 1 (S.D. Fla. Apr. 25, 2006) (quoting *Burtman v. Technical Chemicals & Products, Inc.*, 724 So. 2d 672, 676 (Fla. 4th DCA 1999)).

As detailed above, the UCC obligates the issuer of a cashier's check "to pay the instrument . . . [a]ccording to its terms at the time it was issued . . . ." Fla. Stat. § 673.4121. This provision preempts any obligation under the common law that Defendant might have had to stop payment on the cashier checks. Therefore, Plaintiff's claims for aiding and abetting fraud and negligence are preempted and shall be dismissed.[9]

### C.      Failure to State Claims

Even if the UCC did not preempt Plaintiff's claims, the Court finds that Plaintiff fails to adequately allege its claims for aiding and abetting fraud and negligence.

### 1.      Aiding and Abetting Fraud

To state a claim for aiding and abetting fraud under Florida law, a plaintiff must allege "(1) the existence of an underlying violation; (2) knowledge of the violation by the alleged aider and

---

[9] To the extent Plaintiff argues that its claims are based on the initial wire transfer, those claims are also preempted by the UCC. *See Regions Bank*, 345 F.3d at 1274 (holding that because it preempted certain common law claims, Article 4A now represents the "exclusive means of determining the rights, duties and liabilities of the affected parties *in any situation covered by particular provisions of* [Article 4A]." (emphasis in original).

abettor; and (3) the rendering of substantial assistance in committing the violation by the alleged aider and abettor." *Rusty115 Corp. v. Bank of America*, No. 22-cv-22541, 2023 WL 6064518, at *6 (S.D. Fla. Sep. 18, 2023). "While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Id.* (internal quotation omitted). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* (internal quotation omitted). "[T]o establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud is the crucial element." *Id.* (internal quotation omitted).

Here, Plaintiff fails to adequately allege that Defendant had knowledge of the fraud or that Defendant substantially assisted the fraud. As pled the in the Complaint, Defendant was not notified of any suspicious actively until after the business email compromise and the romance scams were complete. In addition, there are no plausible allegations in the Complaint that Defendant substantially assisted with the fraud. Accordingly, the aiding and abetting fraud claim shall be dismissed.

### 2.    Negligence

"To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001). Here, Plaintiff fails to allege both duty and proximate cause.

"The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla.*

*Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). "To determine whether the risk of injury to a plaintiff is foreseeable under the concept of duty, courts must look at whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. 4th DCA 2022). "A legal duty does not exist merely because the harm in question was foreseeable—instead, the defendant's conduct must create the risk. In other words, a duty requires one person to control the risk." *Saunders v. Baseball Factory, Inc.* 361 So. 3d 365, 369 (Fla. 4th DCA 2023) (internal citations and quotations omitted).

Generally, "a person has no duty to take precautions to protect another against criminal acts of third parties." *Id.* (internal quotation omitted). "[T]he analysis of a defendant's liability in negligence for the criminal acts of another links the existence of a legal duty to the defendant's special relationship to the injured party or to the defendant's ability to control some aspect of the criminal act." *Id.* (internal quotation omitted).

The Complaint fails to establish that Defendant owed Plaintiff a legal duty of care. Plaintiff does not allege that it had a special relationship with Defendant as a customer or otherwise. *See e.g. Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (holding that a bank had no duty of care to a noncustomer after a fraudulent account was opened in the noncustomer's name); *McCallum v. Rizzo*, No. 942878, 1995 WL 1146812 at *2 (Mass. Supp. Oct. 13, 1995) (holding that "[t]he mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers."). Rather, a plain reading of the Complaint shows that Plaintiff had no relationship with Defendant.[10]

---

[10] In its response to the Motion, Plaintiff argues that Defendant was negligent because after Defendant told Plaintiff, Plaintiff's bank, and law enforcement that it would recall Plaintiff's funds, they stopped or reduced their investigation into finding the missing funds. [ECF No. 11]. However, this theory as to Defendant's alleged duty was not pled in the

In addition, even if Defendant did owe Plaintiff a legal duty of care, Defendant did nothing to breach that duty. In the Complaint, Plaintiff alleges that Defendant breached its duty to safeguard Plaintiff's funds because "it facilitated or allowed the withdrawal of funds from Ms. Gibson's account via the cashing of a cashier's check to an unauthorized party." [ECF No. 1 ¶ 86]. However, as detailed above, Defendant was not obligated to stop payment on the cashier's checks. In fact, Defendant, by law, could not stop payment on the cashier's checks. Accordingly, the Complaint fails to adequately allege a claim for negligence.

<u>**Conclusion**</u>

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant's Motion to Dismiss, [ECF No. 8], is GRANTED.

2.  Plaintiff's Complaint is DISMISSED without prejudice.

3.  This case is CLOSED for administrative purposes and all pending motions are DENIED as MOOT.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of February, 2024.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

---

Complaint; and, even if it were, it does not change Defendant's legal obligation to honor the cashier's checks after they were issued.

Moreover, Plaintiff's arguments that Defendant refuses to provide any additional information to Plaintiff and that the amount of missing funds does not exactly match the amount on the cashier's check are misplaced. As set forth above, Defendant has no duty to Plaintiff and, as a result, has no duty to provide any additional explanation to Plaintiff as to Defendant's efforts to recover the funds or why there may be a discrepancy between the amount of funds missing and the amount of the remanding cashier's check.